# IN THE COURT OF APPEALS OF TENNESSEE
## AT KNOXVILLE
### Assigned on Briefs April 29, 2010

# IN RE CHASE A. C.

**An Appeal from the Juvenile Court for Campbell County**
**No. J0009043      Joseph M. Ayers, Judge**

_____

**No. E2009-01952-COA-R3-PT - FILED AUGUST 18, 2010**

_____

This is a termination of parental rights case. The child at issue was removed from his father's home based on allegations of physical abuse and inability to control the child's behavior. After the child was placed in state custody, the state developed a permanency plan. The father timely performed some of his assigned tasks under the plan, but not others. As to the tasks he completed, the father did not submit documentation to show completion. Eventually, the state filed a petition to terminate the father's parental rights. After a trial, the trial court terminated the father's parental rights based on abandonment for failure to provide a suitable home, substantial noncompliance with the permanency plan, and persistent conditions. The father now appeals, arguing that the state did not make reasonable efforts to reunify him with the child. We agree that the State did not make reasonable efforts at reunification, and we further find that the State did not by clear and convincing evidence show that termination of the father's parental rights is in the child's best interest. Therefore, we reverse the termination of the father's parental rights.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court is Reversed**

HOLLY M. KIRBY, J., delivered the opinion of the Court, in which ALAN E. HIGHERS, P.J., W.S., and J. STEVEN STAFFORD, J., joined.

David K. Vander Sluis, Oak Ridge, Tennessee, for the Appellant, Ronnie Cupp

Robert E. Cooper, Attorney General & Reporter, Michael E. Moore, Solicitor General, and Douglas Earl Dimond for the Appellee, State of Tennessee Department of Children's Services

## OPINION

### FACTS

Respondent/Appellant Ronnie C. ("Father") and Respondent Tracie Lynn B. ("Mother") are the biological parents of the child at issue, their son, C.A.C., born on February 17, 1997. Mother and Father were never married to each other. Father has been C.A.C.'s sole residential parent since C.A.C. was three years old. At all pertinent times, Mother lived in Ohio, and Father and C.A.C. lived in Caryville, Tennessee, located in east Tennessee near Knoxville.

Father has a tenth grade education. Since the age of twelve, he has suffered from a degenerative bone disease, for which he takes the prescription pain medication Oxycodone four times a day. He also sustained damage to his heart, brain, and lungs from exposure to carbon monoxide in 1990. Despite his physical difficulties, Father earns his living in construction and masonry work, and he also does odd jobs such as repairing electronics.

When C.A.C. was three years old, Mother left the home. For a long while, Father and C.A.C. lived by themselves. At some point, Father married Shawn C. ("Stepmother"), who had two daughters, one older and one younger than C.A.C. After Stepmother and her daughters moved into the three-bedroom mobile home with C.A.C. and Father, C.A.C. began exhibiting behavioral problems and jealousy toward Stepmother and her daughters. He began smoking cigarettes, engaged in behaviors that could start fires, broke another child's finger at school, was suspended from school for fighting, and was often untruthful. Father tried withholding privileges, holding family meetings, and utilizing corporal punishment, to no avail. In 2007, C.A.C. was diagnosed with reactive attachment disorder at Ridgeview Psychiatric Hospital & Center, Inc. ("Ridgeview"). Counseling for C.A.C. was recommended, but Father was unable to pay for it.

The family's difficulties culminated in a report to the Child Protective Services division ("CPS") of the State of Tennessee Department of Children's Services ("DCS"). On February 21, 2008, CPS received a referral from C.A.C.'s school regarding C.A.C., then eleven years old. The referral stemmed from a statement to school personnel by one of C.A.C.'s stepsisters that Stepmother had twisted C.A.C.'s arm and that Father had hit C.A.C. in the face until he got a bloody nose. CPS investigator Melia Henegar ("Henegar") went to the school to investigate. She observed dried blood in C.A.C.'s nose, several bruises on his shin and his eyes, and markings on his neck. She was informed that C.A.C. had been in a physical

altercation with another child at school that day.[1]  However, when Henegar spoke to C.A.C. about his injuries, he told her that, the prior weekend, Father had kicked him in the shin continuously "for no reason."  He told her that he was scared to talk about the incident, because his dad would go to jail and things would be "worse than it ever was before." C.A.C. told Henegar that Stepmother yelled at him and talked to him "like a dog" and wanted him out of the home.  It was reported that the parents put an alarm on C.A.C.'s bedroom and closet door, and that he was often locked in his bedroom and required to obtain permission to leave his room to eat, drink, or use the bathroom.

That day, Father and Stepmother were called to the school to meet with Henegar.  They denied the abuse allegations but agreed to sign a document allowing C.A.C. to stay with his grandparents until CPS could conduct an investigation.  Stepmother's two daughters stayed at a friend's house during the investigation.

The next day, on February 22, 2008, a DCS child and family team meeting was held at the DCS office.  During the meeting, Father and Stepmother told DCS personnel that they could not control C.A.C.'s behavior or address his issues at home, and they did not have any friends or family who would be able to care for C.A.C. while CPS completed its investigation.  The team decided that the best course of action would be to place C.A.C. in State protective custody.  The two stepsisters were returned to the home on March 3, 2008, because there was no evidence that they had been abused, and they reported that "the things that were happening to [C.A.C.] did not happen to them."

On February 26, 2008, DCS filed a dependency and neglect petition with respect to C.A.C. against Father and Mother based on the above facts.  On the same day, the trial court entered a temporary order placing the child in DCS custody pending a final hearing.  Attorney Robert Asbury was appointed as C.A.C.'s guardian ad litem ("GAL").  Because of the child's behavioral problems, he was placed in Youth Villages (formerly known as Boys Town), a remedial agency located in Memphis, Tennessee, a five- to six-hour drive from Father's home in Caryville.  Psychiatrists at Youth Villages prescribed C.A.C. medications such as Risperdal for insomnia, anger, and suicidal ideations.  Meanwhile, the hearing on the dependency and neglect petition was scheduled for April 17, 2008.

Prior to the April hearing, on March 12, 2008, DCS developed the first permanency plan for C.A.C., with a target completion date of August 22, 2008.  On March 17, 2008, Father, Stepmother, and DCS representatives met to review the parenting plan and discuss the goals and requirements in the plan.  Mother, who lived in Ohio, did not participate in this meeting. The parenting plan provided that both Father and Mother could have supervised visits with

[1]C.A.C.'s bruises were apparently not caused by this fight.

C.A.C., as well as telephone contact. Stepmother, however, was not allowed to have contact with him. The plan provided that the parents were required to visit C.A.C. a "minimum of 4.3 hours a month," and that the parents would "provide [their] own transportation to and from the visitation." DCS's responsibilities under the plan were to supervise visitation, monitor the progress of the parent/child visitation, and document the progress. DCS was also "responsible for obtaining approval from the Court and arranging visitation between parents and placements."

The goal of the permanency plan at that point was either reunification or adoption. For reunification, Father, Stepmother, and Mother were required to (1) maintain stable housing and provide verification to DCS, (2) provide appropriate furnishings for C.A.C.'s bedroom, (3) provide verification of employment to DCS, (4) complete a mental health assessment at Ridgeview and complete all recommendations arising from the assessment, (5) complete an alcohol and drug ("A & D") assessment and cooperate with all recommendations arising from that assessment, (6) cooperate with all recommended treatment for C.A.C., (7) complete parenting classes, and (8) cooperate with in-home visits. Father and Stepmother signed the permanent parenting plan.[2] They also signed forms containing the criteria and procedures for termination of parental rights; the forms indicate that Father and Stepmother had read and understood the possible grounds for terminating parental rights.

On April 17, 2008, the hearing on the dependency and neglect petition was conducted as scheduled. Father was represented at the hearing by attorney Steve Hurst. Father stipulated that C.A.C. was dependent and neglected, and the trial court approved the DCS permanency plan.[3] On May 15, 2008, the trial court entered an order holding that the child was dependent and neglected and that he should remain in DCS custody.[4]

Within one to two months, Father had an alcohol and drug ("A&D") assessment, as required under the permanency plan. However, verification of the assessment was not sent to DCS, as required under the plan. Thereafter, attorney Hurst ceased representing Father, and Father could not pay to hire another attorney.

In the same time period, Father arranged for his own mental health assessment at Ridgeview, as required under the permanency plan. The mental health assessment was conducted on

---

[2]Mother did not participate in the team meeting and did not sign the parenting plan.

[3]For reasons not clear in the record, the order approving this plan was not entered until March 4, 2009.

[4]Although the order required Father to "submit to a hair follicle test," this was not done. Father later explained that he was willing to do the hair follicle test, but DCS never called him to schedule it. The case manager at the time later could not recall why the hair follicle test was not done.

May 15, 2008. In the course of his mental health evaluation, Father denied that either he or Stepmother physically abused C.A.C., claiming that the bruises on the child's leg were sustained in a fight at school. Father also denied that he had any mental health or A&D issues. He told the Ridgeview personnel that he needed help to address his son's behavior and asked about services available to C.A.C. after his discharge from Youth Villages. The report of the mental health assessment states that Father became "very upset" when he was told that services could have been made available to C.A.C. prior to his being taken into State protective custody. The report indicated that the family would receive group therapy at a later date to be determined, and that Father would contact Ridgeview when the child was discharged from Youth Villages to schedule these services. It is unclear whether Father signed a release to have his mental health assessment sent to DCS but, regardless, the report was not sent to DCS as required under the permanency plan.

After C.A.C. was sent to Youth Villages in Memphis in February 2008, Father was unable to travel the considerable distance from East Tennessee to visit him because his car was unreliable and he could not afford more reliable transportation. However, C.A.C. telephoned Father every Monday and Wednesday evening for telephone visitation.[5] In early summer 2008, Youth Villages decided that it was necessary to discontinue Father's telephone visits because, after each call, C.A.C. would become upset and repeatedly hit his head against a wall. Father was told that their telephone visits would be temporarily discontinued, for a period of sixty to ninety days to see if C.A.C.'s behavior improved.

On July 24, 2008, the trial court conducted a judicial review of the case. Present at the hearing were C.A.C., the GAL, representatives of DCS, and the DCS case manager at the time, John Davis. Father did not appear at the hearing; he later claimed that he was not notified of it until one hour prior to the hearing. The order entered after the hearing noted that DCS had stopped Father's telephone contact with C.A.C.; for reasons that are unclear in the record, the order states that the trial court had determined that Father "has caused problems at the child's placement facility."[6] The order did not describe the no-contact provision as temporary or include an anticipated end date for it. The order found that C.A.C. should remain in DCS custody, and that DCS was "making reasonable efforts toward

_____

[5]Under the privilege system at Youth Villages, the telephone visitation had to be initiated by C.A.C. rather than by Father.

[6]In the appellate record, the GAL confirmed Father's version of the events that led to discontinuation of the telephone visits. Father stated that the telephone calls between C.A.C. and Father were "going great," but after C.A.C. would hang up the telephone, he would begin hitting his head against a wall, apparently because he wanted to return home. The record does not indicate any conduct by Father that caused disruption to C.A.C. at Youth Villages.

reunification or toward making a permanent and appropriate placement for the children [sic] and toward preventing the children [sic] from continuing in foster care unnecessarily."

Meanwhile, Mother had been contacted by the counselors at Youth Villages, and spoke to them regularly by telephone.[7] Apparently she told them that she was attempting to prepare her home for C.A.C. upon his discharge. Evidently, this raised some hope on the part of DCS officials that Mother might be able to take custody of C.A.C. Indeed, in June 2008, Youth Villages provided Mother with a bus ticket from Ohio to Memphis and put her up in a local motel, to enable her to visit C.A.C. and attend a DCS team meeting. Soon after the visit, however, Mother stopped contacting C.A.C., DCS, and Youth Villages. Since that time, she has had no involvement in the child's life.

In approximately August 2008, DCS caseworker John Davis visited Father's mobile home to determine if it was suitable for C.A.C. to live there.[8] In the mobile home, Father had repaired and painted the walls in C.A.C.'s bedroom, but the room had only a bed frame and did not have a mattress.[9] Thereafter, Father obtained a new mattress for C.A.C.'s room. However, there were no follow-up home visits by DCS officials to review C.A.C.'s bedroom.

Sometime in August or September 2008, DCS held another team meeting in which Father participated by telephone. Father told DCS officials in this meeting that he had completed the mental health and A&D assessments required under the permanency plans; however, DCS had not received documentation on the assessments. Father was told that DCS/Youth Villages had paid for Mother to come from Ohio to visit C.A.C.; however, Youth Villages was still prohibiting Father from telephone visitation with C.A.C. at this time, and the prospect of DCS facilitating Father's travel to Memphis to visit C.A.C. was not discussed in the meeting. Father was informed at this meeting that DCS was considering having Father's parental rights terminated based on his failure to accomplish his responsibilities in the permanency plan.

---

[7] Mother indicated to officials that she was afraid of Father.

[8] Davis said that this visit took place in August 2008; other evidence in the record indicates that this visit took place in December 2008 just before a team meeting. Whether the visit took place in August or December 2008 is irrelevant to our analysis here.

[9] Father explained that the mattress had to be replaced because C.A.C. had urinated on it. Father would later testify that the room was fully furnished except for the mattress, but the DCS case manager said that there was no furniture in the room, besides the bed frame. Regardless, DCS indicated that the lack of a mattress was the factor that made the room unsuitable for C.A.C.

In August 2008, Father and Stepmother were arrested for manufacturing methamphetamine and were taken into police custody. Based on this arrest, CPS received another referral, this one regarding Stepmother's daughters, who lived in the home. Brandi Smith ("Smith"), a CPS investigator, met with Father about the allegations, and conducted a drug test on Father; the test returned positive for both methamphetamine and opiates. Father and DCS entered into a consent protection order, under which Father was to stay away from the home and would be permitted supervised visits with his two stepdaughters. Pursuant to the agreement, Father enrolled in a drug treatment program. While he was in treatment, Smith conducted a random visit at Father's home at 7:00 a.m. one morning. Although Stepmother told Smith that Father was not living there, Smith found Father hiding in the closet in his underwear, obviously in violation of the order that he not stay in the home. Eventually, Father was discharged from the drug treatment program because he continued to take the opiate-based medication prescribed for his degenerative bone condition, which was not permissible under the drug treatment program. Nevertheless, because Father did not test positive for methamphetamine or other non-prescription drugs during the two months after the DCS referral, DCS permitted him to return to the home with Stepmother and her daughters. The methamphetamine charges against Father and Stepmother were later dismissed.

Around the same time, Father and Stepmother were arrested for theft at a gas station at which Stepmother worked as a cashier. They pled guilty and were ordered to pay a $450 fine by February 17, 2009. Because the fine was not paid in a timely manner, both were briefly jailed in February 2009 and released shortly thereafter.

In October 2008, DCS moved C.A.C. from the Youth Villages facility in Memphis to a Youth Villages therapeutic foster home in Knox County, a thirty to forty minute drive from Father's home. However, DCS did not immediately inform Father that C.A.C. had been moved from Memphis to Knox County; Father was not notified until November or December 2008. By this time, DCS had essentially made a decision to seek the termination of Father's parental rights.

On December 19, 2008, DCS held a child and family team meeting at the DCS office in Campbell County. Both Father and C.A.C. were present at the meeting, and this was the last time Father saw C.A.C. before the termination petition was filed. Father was permitted to have a brief supervised visit with C.A.C., at which time he gave the child Christmas presents to celebrate the holiday. Within a few months after that, C.A.C. was moved to another therapeutic foster home, at least in part because his behavior continued to be problematic.

In January 2009, Father was arrested for possession of drug paraphernalia, namely, syringes found in a coat in his home. According to Father, he used the syringes to inject Oxycodone,

the prescription medication he took for his degenerative bone condition. Father entered a guilty plea to the charge and was sentenced to two years probation.

## PROCEEDINGS BELOW

On February 11, 2009, DCS filed a petition to terminate the parental rights of both Mother and Father based on four grounds: (1) abandonment for failure to visit the child in the four months preceding the petition (T.C.A. §§ 36-1-113(g)(1) & 36-1-102(1)(A)(i)); (2) abandonment for failure to provide a suitable home for the child (T.C.A. §§ 36-1-113(g)(1) & 36-1-102(1)(A)(ii)); (3) substantial non-compliance with the permanency plan (T.C.A. § 37-2-403(a)(2)(C)); and (4) persistent conditions which led to the child's removal from the home (T.C.A. § 36-1-113(g)(3)).[10]

Shortly after the termination petition was filed, Father and Stepmother arranged to take parenting classes required under the permanent parenting plan. Documentation on their completion of the parenting classes was submitted to DCS in May 2009.

On June 11, 2009, the trial court conducted a hearing on the DCS termination petition against Mother and Father.[11] Father was the first to testify. He stated that he and his family have lived in the same mobile home in Caryville since November 2007. DCS apparently had on file another address for him in Jellico, Tennessee, but Father explained that the Jellico address was his own father's home, where he had lived for some time. Father testified that he has five other biological children but does not have custody of any of them.

Father indicated that C.A.C. began behaving badly when Stepmother and her two daughters moved in with them; he surmised that C.A.C. was jealous of the time Father spent with them.[12] Father described C.A.C. as being "out of control," and he said that the discipline techniques he employed did not work. After C.A.C. was diagnosed with reactive attachment

---

[10]In May 2009, CPS received another referral on Father. This referral was based on an allegation by one of Father's stepdaughters that she no longer wanted to live in the home because Father was beginning to treat her as he had treated C.A.C. Brandi Smith was the CPS investigator on this referral as well. Smith went to the school to meet with the stepdaughter, but she observed no bruising or other signs of physical abuse. The family received home services from DCS while the stepdaughters continued to live in the home. This investigation was ongoing at the time of the proceedings below, and the record does not indicate that a DCS petition was filed related to these allegations.

[11]Mother did not appear at the hearing.

[12]The record does not reflect when Father and Stepmother married.

disorder in 2007, counseling was recommended, but Father could not afford to pay for counseling.

Father claimed that, before C.A.C. was taken into custody, he called DCS and "begged for [outside] help . . . [for] [s]omebody to show me what I can do." He stated that, at the time, a DCS worker visited his home but gave him no advice or instruction on how to deal with C.A.C.'s serious behavioral problems. Father said that he was advised by the C.A.C.'s probation officer that he could file an "unruly child" petition with the court.[13] Father did not do so, however, because he was told that filing such a petition could result in C.A.C. remaining in State custody until he was eighteen years old. Father thought that family counseling would have helped him take care of C.A.C., and that "[i]f we could all meet as a family and start addressing the issues or the problems in the home and try to find a solution for them," the situation would improve. Even after C.A.C. was taken into State custody, Father said, he received no help from DCS in trying to resolve these problems, stating that "nobody recommended nothing" to help with C.A.C.'s behavior problems. When Father was asked what he could do differently to control C.A.C.'s behavior, he could not describe any new strategies; he thought that the separation would ultimately help C.A.C. control his behavior. He wished that the DCS case managers would have offered him more help.

At the March 2008 DCS meeting regarding the permanency plan, Father testified, case manager John Davis read parts of the parenting plan and the criteria for termination to him. He did not read the document itself, Father explained, but he signed it to acknowledge that he had received it. Attorney Hurst never reviewed the documents with Father.

Once C.A.C. was brought to the Youth Villages facility in Memphis, Father said, he was unable to visit him due to lack of transportation. Father had a vehicle, but he described it as "hideous" and unreliable, insisting that it would not have been able to travel safely from Caryville to Memphis. Father claimed that he told DCS that he needed assistance to visit C.A.C. in Memphis, but none was forthcoming. When Father learned that DCS/Youth Villages had provided Mother with a bus ticket from Ohio to Memphis to visit C.A.C. and paid for a motel room for her, Father said it "kind of tore me up" because he was never offered such assistance.

Father testified about the discontinuation of his telephone visitation in the summer of 2008. He said that his telephone calls with C.A.C. were "going great," but C.A.C. would hit his head against a wall after their phone calls ended because he did not like living at Youth Villages and wanted to return home. Father claimed that he did not attend the court hearing in July 2008 because he only found out about the hearing one hour before it began.

---

[13]The record does not reflect how the child came to have a probation officer.

According to Father, DCS case manager Davis told him that it was "not an important hearing, but it was something that they had to do. But to do it, they just had to run it through the judge so they can observe [the child's] behavior." By that time, Father had no attorney. Father received in the mail a copy of the trial court's August 2008 order on the hearing, and he understood it to mean that he was to have no further contact with C.A.C.

Father said that he was never told that he had permission to resume having contact with C.A.C. He claimed that he called case manager Davis several times about setting up visitation with C.A.C., but that Davis could not be reached. Father first learned that C.A.C. had been moved from Memphis to foster care in east Tennessee at the December 2008 meeting; C.A.C.'s move back to east Tennessee had taken place some two months earlier, in October 2008. In the December 2008 meeting, Father asked about reinstating telephone visitation, but Davis told Father that he would have to file a motion in court to get visitation in light of the existing court order. Father said that he could not afford another attorney at that time to pursue visitation. He indicated that, had he known that visitation with C.A.C. could have been arranged, he would have visited.

Father asserted in his testimony that he had completed his responsibilities under the parenting plan. He had an adequate bedroom for C.A.C. in his home. He completed the renovation of the child's bedroom in January 2009; he repaired the walls, painted, and added a ceiling fan, a television, and other furniture for the room. He said that when DCS case managers Davis and Leah Baird ("Baird") inspected the home in December 2008, C.A.C.'s room contained a bed frame but not a mattress and box springs; he had to discard the old mattress because it was urine-stained. Father testified that he obtained a mattress for the bed two days after that visit. He claimed that he called Davis and left a message that C.A.C.'s room had been completed, but he never received a response, and DCS never did another home visit to see the completed room.

Father said that he completed the mental health assessment as required under the permanency plan. When asked about the recommendations on the assessment, Father seemed unaware that the assessment form recommended that he contact Ridgeview for counseling upon C.A.C.'s discharge from Youth Villages. He stated that he thought that he was finished with his responsibilities after the assessment was completed, and that "[n]othing was mentioned about a program." Father testified that he had signed a release in order for DCS to obtain a copy of his mental health test results, and in fact signed medical release forms at the March 2008 DCS team meeting.

Father also said that he completed his A&D assessment within two weeks after C.A.C. was removed from the home, as required by the permanency plan. He claimed that the result of the drug screen was "clean." He said that the test administrator attempted to fax the results

to DCS three times, but for some reason the fax would not go through.  In any event, he stated, DCS was aware that he had completed the A&D assessment.  Father said that, in December 2008, he compiled his test results and delivered them to DCS in a black folder with other important documents, but DCS later claimed that it lost the documents.

Father testified that he first found out that he was required to complete parenting training during a telephonic meeting with DCS that took place in November 2008.[14]  He claimed that he started the classes as soon as he learned that they were required, and that he completed the classes one month prior to trial.  He explained that his completion of the program was delayed by several adversities, including his month-long hospitalization in January and February 2009 with double pneumonia, and the death of his sister-in-law in a car accident in March 2009.

Father's testimony about his employment was somewhat unclear.  At the time C.A.C. was taken into protective custody, Father had regular employment with S&A Construction.  He said that DCS never asked him to provide verification of employment after the May 2008 DCS team meeting.  At the time of trial, Father said, he was working temporarily for A & G Construction, Inc., and earning extra money "on the side" by repairing small electronics, cleaning and restoring computers, and working on cars.  Father conceded that he struggled with maintaining permanent employment, commenting that he was "barely getting enough work to keep the train moving."  Father testified that he had twice applied for disability benefits, was denied both times and appealed both times, "waited forever, and did the appeal again."  After being turned down the third time, he said, "I just went back to work and made do the best I could."  Asked if he would pursue disability benefits again, Father said, "I had thought about it, but I don't have that time to waste.  I've got to keep working."  At the time of trial, Father had delivered job applications to sixteen steel companies and a staffing agency, and he hoped to obtain regular employment with one of them.  He did not have health insurance, because neither of the construction companies for which he worked provided health insurance.  Father said that he would not be able to afford regular counseling for C.A.C. if he were placed back in the family home.

Father testified about his criminal history.  He denied having methamphetamine in his home when he was arrested in August 2008, noting that the charges were ultimately dismissed.  He claimed that the DCS drug test at that time was positive for methamphetamine because he had been given the drug by a nurse at the jail.   The positive result for opiates was because of his prescription medication.  The same day that the methamphetamine charges were brought, Father and Stepmother were charged with theft at the convenience store at which

---

[14]Father first recalled that the conference call took place in August 2008, but later said that it took place in November 2008.

she worked. He pled guilty to the theft charge and was ordered only to pay a fine, but was jailed briefly in February 2009 because he paid that fine one hour too late. Father conceded that he was arrested again in January 2009 for possession of drug paraphernalia, but explained that the "paraphernalia" consisted of the syringes he used to inject the Oxycodone prescribed to him in pill form for the pain from his degenerative bone condition. Nevertheless, he pled guilty to that charge in March 2009. Father acknowledged the importance of staying out of criminal trouble in order to regain custody of his child.

The trial court then heard testimony from the various DCS personnel. CPS investigator Henegar testified about her February 2008 visit to investigate the original referral from C.A.C.'s school and about the subsequent dependency and neglect petition filed by DCS. Her role in the case ended after C.A.C. was placed at Youth Villages in Memphis.[15]

All three of the DCS case managers who had responsibility for C.A.C. testified at trial. Lisa Jeffers ("Jeffers") was the case manager from the beginning of the case (March 2008) until May 2008.[16] By the time Jeffers was assigned to the case, C.A.C. had already been placed at Youth Villages in Memphis. She testified that she "would say" that she spoke to C.A.C. once a week on the telephone, and visited with him once a month. Jeffers received reports from Youth Villages that C.A.C. acted out frequently, especially during bedtime, because he was afraid that someone would disturb him at night. She did not recall any recommendations by Youth Villages as to family counseling or other treatment for C.A.C. Asked "[w]hat was the point of [C.A.C.] being down in Youth Villages?" Jeffers replied, "I don't know."

Jeffers could not recall her conversations with Father after C.A.C. was taken into protective custody, but she had the impression that Father and Stepmother blamed the child for their failure to exert control over him. In the beginning, Jeffers stated, Father and Stepmother were cooperative, remained in contact with her, and returned her calls as needed. Over time, she asserted, their contacts became more sporadic. However, she conceded that she really had "no idea" how often she and Father were in contact.

Jeffers was present at the March 2008 DCS team meeting and remembered explaining to Father and Stepmother their responsibilities under the permanency plan. However, she recalled little beyond that. She did not recall the tasks assigned to Father under the plan and

---

[15]CPS investigator Smith testified about her two investigations on the referrals regarding Father's stepdaughters in September 2008 and May 2009. Those investigations related to Father as a stepparent to the two stepdaughters, not as C.A.C.'s biological parent, and she said that DCS's actions on these referrals were quite limited.

[16]Jeffers ended her employment with DCS in May 2008.

did not recall receiving the results of a mental health assessment, A&D assessment, or proof of his employment.

Asked about any assistance provided to Father to travel from east Tennessee to Youth Villages in Memphis to visit C.A.C., Jeffers responded that it was not "a part of the Department's criteria to take them to Memphis." She explained, "it's up to the parents to get wherever the child is located. We don't do transportation." When asked how she assisted Father in obtaining the required mental health assessment, Jeffers answered, "I gave him the phone number. We're not allowed to set that up because he's not a child, he's an adult."[17] She could not recall whether she followed up to determine whether he had completed that assessment. Regarding the A&D assessment, Jeffers again said that she gave Father the telephone number, and she could not recall whether Father actually set up the A&D assessment. When asked about her assistance with the permanency plan requirement of parenting education, Jeffers was unsure, stating, "I'm sure I probably recommended a phone number." She did not recall any in-home assistance being provided to Father. She had no meetings with Father outside of the scheduled DCS team meeting and a court date. Jeffers was asked, "So to sum this up, the extent of what you did to assist [Father] in this whole matter was to give him several phone numbers?" Jeffers replied, "Yes, sir."

The next DCS case manager to testify was John Davis, the case manager for C.A.C. for the four-month period from May 2008 to August 2008. During the time in which Davis was assigned to the case, he understood that Youth Villages had said that "no visits should occur between the father and the child" in order "to assess [C.A.C.'s] behavior without contact with [Father]." Davis said that this directive came from Youth Villages personnel, not from DCS case managers or from a court order. Consequently, Davis did not attempt to help Father visit the child.

Youth Villages did, however, facilitate Mother's travel from Ohio to Memphis to visit C.A.C. on June 27, 2008, in Memphis at Youth Villages for a child and family team meeting. Davis testified that Mother was "setting up for home services in Ohio" and commented that things were "really looking good for her at that time." Davis said that Mother later

---

[17]Some parental termination cases have noted DCS efforts to assist parents by setting up mental health appointments for them. *See, e.g., In re Derrick B.*, No. M2008-01162-COA-R3-PT, 2008 WL 5424078, at *8-9 (Tenn. Ct. App. Dec. 30, 2008) (noting that DCS set up mental health appointments for the father). Other parental termination cases have reflected assistance by a DCS case manager by helping the parent schedule such appointments or providing transportation for such appointments. *See In re J.D.L.*, No. M2009-00574-COA-R3-PT, 2009 WL 4407786, at *2 (Tenn. Ct. App. Dec. 2, 2009)(noting that DCS helped the mother make appointments and provided bus fare for the appointment); *DCS v. Wright*, No. M2008-01607-COA-R3-PT, 2009 WL 302292, at*2-3 (Tenn. Ct. App. Feb. 6, 2009) (noting that DCS set up an initial mental health appointment).

encountered personal problems and "just kind of lost contact" with DCS in August 2008. She never again visited C.A.C. after the June 2008 meeting.

Davis said that Father would have been invited to the June 2008 meeting, but they were unable to contact him at that time because one of the telephone numbers that Davis had for Father had been cut off. Also, Davis was given two addresses for Father by DCS, one in Caryville and one in Jellico. However, Davis did not send any correspondence to Father at any address. Eventually, the communication problems were resolved.[18] Davis made one visit to Father's home to inspect C.A.C.'s bedroom. The visit revealed that the child's room contained only a bed frame and was not then suitable for the child. Davis made no other visits to Father's home. He conceded that one home visit over a period of three or four months was below the standard number of home visits in a typical DCS case.

Davis testified that Father told him that he wanted a face-to-face visit with his son. DCS tried to set up a team meeting in Memphis, but when they discussed a Memphis meeting with Father, he told Davis that he had difficulties with his vehicle and could not travel to Memphis. So the team meeting was set up for east Tennessee.

Davis testified that the persons present at the August 2008 team meeting included him, incoming case worker Leah Baird, Father, Stepmother, and C.A.C. The meeting was held in the DCS office in Campbell County in east Tennessee. Davis reviewed with Father the progress on his assigned tasks under the permanency plan. Davis said that Father told him that he had completed his mental health assessment and his A&D assessment; however, DCS had not received the results of those assessments. Davis conceded that he took no initiative to get those records himself. Father did not provide verification of employment at that time. Davis did not recall about the parenting class requirement of the plan. At that meeting, Davis informed Father that DCS was beginning to consider terminating Father's parental rights based on his failure to comply with the plan. This disclosure upset Father, so he refused to sign the plan. Father's visitation with C.A.C. was not discussed at the August 2008 meeting.

The next case manager assigned to C.A.C.'s case was Leah Baird. Baird testified that she was the case manager from late August or September 2008 until the time of trial. By the time she received the case, Baird stated, DCS had essentially made a decision to seek the termination of Father's parental rights. Differing from Davis's testimony, Baird recalled that Father and Stepmother participated in the August 2008 meeting by telephone only. Baird said, however, that Father and Stepmother were both present at a September 2008 team

_____

[18]Apparently, DCS at all times had two addresses and at least two telephone numbers in the file for Father, and this created some confusion for the case managers in attempting to contact Father. At all times, however, DCS had at least one operable telephone number and Father's correct address.

meeting, and that C.A.C. was present as well.[19]  She claimed that she discussed the permanency plan with Father.  Baird said that Father was informed at that meeting that he was required to visit C.A.C. at least 4.3 hours per month.  When asked whether she assisted Father in visiting the child while he was at Youth Villages, Baird testified that she "wasn't aware of any problems about visiting," and was not made aware that Father did not have a reliable vehicle.  Baird said that she attempted to visit Father in his home in Caryville two times in October or November.  The first time no one was home, and the second time a meeting had been pre-arranged, but Father had to cancel.

Baird testified that, in late October 2008, C.A.C. was moved from Memphis to a Youth Villages therapeutic foster home in Knox County, about 40 miles from Father's home in Caryville.  However, Baird did not inform Father that the child had been moved until "[p]robably in November," but at least by the December 2008 DCS team meeting.

Baird stated that, at the December 2008 team meeting, she did not have documentation that Father had completed parenting classes, or documentation of Father's mental health assessment, A&D assessment, or employment.  Father had informed Baird at an earlier meeting that he had completed the mental health assessment at Ridgeview, so Baird called Ridgeview to get a copy of the results but was informed that there was no release on file signed by Father.  Baird did not attempt to obtain a release form for Father to sign, nor did she ask Ridgeview to send a release to Father.  Baird called and sent emails to obtain Father's A&D assessment, but she claimed that she did not receive it "until later."  Baird said that Father called her only once or twice during the period in which she was assigned to C.A.C.'s case, and she perceived that he was not informed or involved.

When Baird was asked if she tried to contact Father about visiting C.A.C., she responded, "No.  The parents are supposed to contact the workers to try to set up visitations."  She explained that she does not "have to initiate phone contact, or to make [a parent] be involved" in his child's case.  She never asked Father if he was able to get to visitation with C.A.C. in his vehicle.  Baird could not recall whether she informed Father that the Youth Villages no-contact policy had expired and that he was again permitted to have telephone contact with C.A.C.

Baird was asked about C.A.C.'s condition.  She testified that, at the time of the hearing, he was still in a Youth Villages therapeutic foster home.  C.A.C. attended counseling once a

---

[19]Baird's testimony regarding the dates of the team meetings and the attendees was unclear.  After recalling one meeting in August in which Father participated over the telephone, and one in September at which Father was present, Baird later said that she first met Father in person in October or November 2008, and still later stated that she "probably" first saw him in person at the home visit in December 2008.

week, as he still had some behavior problems. Baird said that when she tried to explain to C.A.C. that DCS was attempting to terminate Father's parental rights, he elaborated on the conditions in his Father's home; for example, C.A.C. stated that he was locked in his room and had to ask for food and to be permitted to go the bathroom. When asked about C.A.C.'s behavior in the foster home, Baird said that C.A.C. was placed in specialized classes and had gotten involved in fights at school, but added that "he's doing pretty well on his own there."

The trial court also heard testimony from Candace Neill ("Neill"), C.A.C.'s foster care counselor at Youth Villages from December 2008 until the time of trial. Neill was present at the December 2008 team meeting in Campbell County that both C.A.C. and Father attended. She said that, at the team meeting, her contact information was written on a board and was available to Father in that way. Despite attending the meeting with Father, Neill did not, as C.A.C.'s counselor, converse with Father or say anything directly to him. When asked if she ever tried to include Father in her counseling of C.A.C., Neill replied, "I am required to have one birth family contact per month. And I called." Apparently, however, the one number she had been given for Father was not a working number, and she never spoke to him.

At the time of trial, Neill had been meeting with C.A.C. for one hour once or twice per week in his foster home for some six months. She said that C.A.C. had had numerous behavioral problems at school in the previous year, including verbal and physical aggression and issues with female authority figures. When asked whether C.A.C. had shown any progress, Neill replied, "A little." She said that C.A.C. experienced a setback in progress after the December 2008 DCS team meeting, which both C.A.C. and Father attended, and that C.A.C. also regressed after he changed foster homes in March 2009. Neill anticipated that C.A.C.'s problems would be ongoing for some time.

In response to questions by GAL Asbury, Neill testified that, during the time in which she had been C.A.C.'s counselor, C.A.C. had consistently expressed a desire to return home to Father. When asked the reason C.A.C. gave for wanting to return to Father's home, Neill said that C.A.C. told her that he loves Father, admires him, looks up to him, and misses home.

DCS also submitted the testimony of both sets of foster parents with whom C.A.C. had lived after he was moved back to east Tennessee. Kati Wheatley ("Wheatley") was C.A.C.'s foster mother from October 2008 until March 2009. Wheatley testified that C.A.C. was "great" when he first arrived in her home, and that he tried to do well both socially and academically. She said that C.A.C. began to decline after the December 2008 DCS team meeting in which he saw Father for the first time in a long while. During that same time period, C.A.C. was assigned a new counselor at Youth Villages. Prior to that, Wheatley said,

C.A.C. was passing all of his classes; his lowest grade was a "C." He soon began failing all of his classes at school except for one. She said that C.A.C. began lying and disobeying, and he became violent as well. She admitted that he had struck her more than once. On one occasion, he formed a gun with his hands and pointed it at Wheatley's head while she was driving and said, "I'm going to get you, woman." On another occasion, C.A.C. grabbed the steering wheel of her car while she was driving and tried to wreck the car. She described C.A.C.'s bad behavior as intermittent, but said that he was eventually moved out of her family's home because "[h]is behavior became so out of control that we just couldn't do it anymore."[20]

Bobbie Buckner ("Buckner") was C.A.C.'s foster mother from March 2009 until the time of trial. She testified that C.A.C. had had behavioral issues since coming into her care. She told the trial court that C.A.C. gets "plumb violent" when she takes him to visit his psychiatrist; he tried to knock her down several times in the psychiatrist's office, and the female employees in the psychiatrist's office felt threatened by him.

Buckner said that she takes C.A.C. to about six or seven appointments per week for a variety of needs, including the psychiatrist, "med management," and his pediatrician. She named several medications that C.A.C. takes for behavioral and medical issues.[21] Buckner dispenses the medication to him.

Buckner was asked whether C.A.C. had mentioned any episodes of neglect or abuse in his home with Father. She related that C.A.C. had told her that, on one occasion, Stepmother entered his bedroom and "whipped him in the middle of the night, because she had heard a noise." He denied having made the noise, but Stepmother "whipped him anyway."

Buckner described her relationship with C.A.C. as "pretty good. . . . But we've had some trials." She stated that she was willing to adopt C.A.C. if he became available for adoption.

In lieu of calling C.A.C., then twelve years old, to testify at trial, GAL Asbury gave the trial court an oral report. The GAL told the trial court that he had been assigned to C.A.C.'s case from the beginning, and that he did "not take exception" to the DCS petition to terminate Father's parental rights. However, he described for the trial court his view of how C.A.C.

---

[20]GAL Asbury later commented to the trial court that he was "aggravated" that DCS had called Wheatley as a witness because her home "was a disruptive home, and the child suffered as a result of that disruption."

[21]Buckner testified, "He's on Focalin (stimulant ADD medication) in the morning, and Singulair and ranitidine for his stomach. . . . And he also takes ranitidine at night, too. . . . Oh, he . . . takes Celexa, also."

had fared since being removed from his home, and he recounted what C.A.C. had told the GAL that he wants:

> I have spoken to [C.A.C.] on multiple occasions. The reason that I asked his counselor [witness Neill] the series of questions that I did was to see if, in fact, he told her the same things that he does me. And in fact, he does. He is adamant that he would like to go home.
>
> I have told him, quite frankly, that it would be my argument . . . that I disagree with his decision from the Guardian ad Litem standpoint. But he has remained steadfast that he would like to go home.
>
> * * *
>
> The . . . concern that I have — and I don't know how to address this other than just to state it to this Court.
>
> This is a situation that this child is in ways better off since he has been in custody, and in other ways has not improved at all.
>
> I mean, the behaviors that he has now, and the issues that they are struggling with are the same issues that we have been struggling with since he was initially removed. . . .
>
> . . . I am keenly concerned that his behavior is not getting any better since he has been in custody. And I don't know if there's anything we can do about that, other than to make it known that it's not better. And that's my position.

Thus, GAL Asbury reported to the trial court that C.A.C. had essentially not improved while in State custody, and that C.A.C. remained "adamant" that he wanted to return to his home with Father. Nevertheless, GAL Asbury did not disagree with the DCS petition to terminate.

At the conclusion of the hearing, the trial court held that DCS had carried its burden of proving by clear and convincing evidence that grounds existed on which to terminate the parental rights of both Mother and Father, and that terminating their parental rights was in the best interest of C.A.C. On July 2, 2009, the trial court entered an order outlining the basis for its decision. Initially, the trial court noted that Mother was properly served but did not appear or otherwise answer the petition, and that sufficient evidence existed as to all four grounds alleged in the termination petition against Mother.

With respect to Father's parental rights, the trial court held that DCS had failed to meet its burden of proving by clear and convincing evidence that Father abandoned C.A.C. for failure

-18-

to visit. The trial court said that the proof showed that Father reasonably believed that he was not allowed to visit the child:

> Though there was no order of the Court that prevented contact, there was evidence that the Youth Villages agency informed [Father] that he could not contact the child. According to the testimony of John Davis, DCS agreed with the recommendations of Youth Villages and informed [Father] that he could not have phone calls or face to face visits with the child. The current DCS case manager, Leah Baird, testified that during an August 2008 phone conversation with [Father], she discussed the permanency plan with him, including the provision regarding supervised visits for 4.3 hours per month. However, Ms. Baird did not testify that she expressly explained to [Father] that the prior recommendation against contact had been lifted, and it is possible [Father] did not understand that he could now visit. In addition, the child was placed in Memphis from February of 2008 until sometime in October 2008, and [Father], who does not have reliable transportation, could not reasonably be expected to travel such a distance to visit the child. Once the child was moved to the Knoxville area in October 2008, a period of time passed before [Father] was informed of the move. Ms. Baird testified that she informed [Father] of the move sometime in November.

Thus, the trial court found that, because Father was not clearly informed that he could resume visiting C.A.C. and was not told when C.A.C. was moved back to east Tennessee, it was reasonable for him to believe that he could not visit the child.

The trial court held, however, that DCS had proven the other three grounds for termination by clear and convincing evidence. First, the trial court concluded that Father had abandoned C.A.C. by failing to provide him with a suitable home, despite reasonable efforts made by DCS to help Father provide a suitable home.[22] The trial court noted that DCS provided telephone numbers to Father to obtain the required mental health assessment, A&D

---

[22]A parent's rights can be terminated under these circumstances when:

> for a period of four (4) months following the removal, the department or agency has made reasonable efforts to assist the parent(s) or guardian(s) to establish a suitable home for the child, but that the parent(s) or guardian(s) have made no reasonable efforts to provide a suitable home and have demonstrated a lack of concern for the child to such a degree that it appears unlikely that they will be able to provide a suitable home for the child at an early date . . . .

T.C.A. § 36-1-102(1)(A)(ii) (2005 & Supp. 2009).

assessment, and parenting training, and had explained to Father that he needed to obtain a mattress for the bed frame in C.A.C.'s bedroom. The trial court found that Father continued to engage in criminal activity, testing positive for methamphetamine while C.A.C. was in DCS custody. It stated that Father's conduct, particularly during the four months preceding the DCS petition, reflected a "lack of concern for the child to such a degree that it appears unlikely they will be able to provide a suitable home for the child at an early date."

The trial court also held that the State had established by clear and convincing evidence that Father failed to comply substantially with the permanency plan.[23] The trial court found that Father failed to submit documentation to DCS that he completed his responsibilities under the plan in a timely fashion, and that some of the tasks were not completed at all. The trial court noted that DCS "made reasonable efforts to assist [Mother and Father] to complete their responsibilities under the Permanency Plan but that they did not avail themselves of the services and assistance provided by the Department . . . ."

The trial court also found that the ground of persistent conditions had been established by clear and convincing evidence.[24] It explained:

> [C.A.C.] was removed from the home of [Father] on February 22, 2008, due to allegations of physical abuse, and [Father's] statement that he could not control the child's behaviors. . . .
>
> [Father] completed parenting training, but not until after the termination petition was filed. During testimony, [Father] was unable to articulate how he has learned to address the child's behavioral issues. [Father] testified about

---

[23]"Substantial noncompliance by the parent with the statement of responsibilities provides grounds for the termination of parental rights . . . ." T.C.A. § 37-2-403(a)(2)(C) (2005 & Supp. 2009)

[24]Termination of parental rights may be based on a finding that the child has been removed from the parent's home for a period of six months and:

(A) The conditions that led to the child's removal or other conditions that in all reasonable probability would cause the child to be subjected to further abuse or neglect and that, therefore, prevent the child's safe return to the care of the parent(s) or guardian(s), still persist;
(B) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent(s) or guardian(s) in the near future; and
(C) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home . . . .

T.C.A. § 36-1-113(g)(3) (2005 & Supp. 2009).

how he disciplined the child before the removal, but admitted that those discipline techniques were unsuccessful. He could not explain how he would discipline the child differently now. The child's former foster mother, Kati Wheatley, current foster mother, Bobbie Buckner, and counselor, Candace Neill, all provided testimony about the child's behavioral issues. . . . The Court finds that it is clear that the child continues to have significant behavioral issues, and [Father] has not demonstrated that he can now control those issues.

Thus, the trial court found that the original conditions that led to C.A.C.'s removal, namely, the child's behavioral problems and Father's inability to control the behavior, still existed, and that Father had not demonstrated that he can now control C.A.C.'s behavior. The trial court also found that Father had not demonstrated that he could pay for the counseling that C.A.C. would need after he returned to the home. The trial court again found that DCS had used reasonable efforts to assist Father in preparing to care for C.A.C. at home, but that the child still could not safely return home, and the situation would not likely be remedied in the near future. Therefore, it found that the ground of persistent conditions had been established.

The trial court also found clear and convincing evidence that terminating the parental rights of both Mother and Father would be in C.A.C.'s best interest. In addition to the reasons outlined above, the trial court found that both Mother and Father had "no meaningful relationship" with C.A.C. Tracking the language of the termination statutes, the trial court found further that "[c]ontinuation of the legal parent and child relationship greatly diminishes the child's chances of early integration into a stable and permanent home,"[25] commenting that C.A.C. "is very fortunate . . . in that his foster parents are committed to and involved in his treatment plan and are willing to adopt him." Thus, the trial court terminated the parental rights of both Mother and Father and awarded custody of C.A.C. to DCS with the right to place the child for adoption. From this order, Father now appeals.[26]

### ISSUES ON APPEAL AND STANDARD OF REVIEW

On appeal, Father argues that the trial court erred in determining that clear and convincing evidence established that DCS made reasonable efforts to make it possible for C.A.C. to return home. He contends that the evidence at trial, particularly the testimony of the three DCS case managers, shows that DCS did not exercise the reasonable care and diligence

---

[25]*See* T.C.A. § 36-1-113(g)(3)(C).

[26]Mother did not participate in the proceedings below and did not appeal the trial court's termination of her parental rights.

necessary to help him complete his tasks under the permanency plan. Consequently, he maintains, his parental rights cannot be terminated at this juncture.

A biological parent's right to the care and custody of his or her child is among the oldest of the judicially recognized liberty interests protected by the due process clauses of the federal and state constitutions. *Troxel v. Granville*, 530 U.S. 57, 65 (2000); *In re Adoption of A.M.H.*, 215 S.W.3d 793, 809 (Tenn. 2007); *Hawk v. Hawk*, 855 S.W.2d 573, 578-79 (Tenn. 1993); *In re Giorgianna H.*, 205 S.W.3d 508, 515 (Tenn. Ct. App. 2006). While this right is fundamental and superior to the claims of other persons and the government, it is not absolute. *DCS v. C.H.K.*, 154 S.W.3d 586, 589 (Tenn. Ct. App. 2004). It continues without interruption only so long as the parent has not relinquished it, abandoned it, or engaged in conduct requiring its limitation or termination. *Blair v. Badenhope*, 77 S.W.3d 137, 141 (Tenn. 2002); *In re M.J.B.*, 140 S.W.3d 643, 652-53 (Tenn. Ct. App. 2004).

Termination proceedings are governed by statute in Tennessee. A party with standing to seek the termination of the parental rights of a biological parent must first prove at least one of the statutory grounds for termination. T.C.A. § 36-1-113(c)(1) (2005 & Supp. 2009). Secondly, the party seeking termination must prove that termination of the parental rights of the biological parent is in the child's best interest. T.C.A. § 36-1-113(c)(2). Because of the profound consequences of a decision to terminate parental rights, courts must apply a higher standard of proof. Therefore, the elements required for termination of parental rights must be proven by clear and convincing evidence. T.C.A. § 36-1-113(c); *In re Adoption of A.M.H.*, 215 S.W.3d at 808; *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002).

This heightened burden of proof in parental termination cases minimizes the risk of erroneous decisions. *See In re M.W.A., Jr.*, 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998). Evidence that meets the clear and convincing standard "establishes that the truth of the facts asserted is highly probable, and eliminates any serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005) (citations omitted). "It produces in a fact-finder's mind a firm belief or conviction regarding the truth of the facts sought to be established." *Id.* (citations omitted); *see also In re A.D.A.*, 84 S.W.3d 592, 596 (Tenn. Ct. App. 2002).

In light of the clear and convincing standard of proof, a reviewing court must "distinguish between the specific facts found by the trial court and the combined weight of those facts." *In re Tiffany B.*, 228 S.W.3d 148, 156 (Tenn. Ct. App. 2007). When a trial court has seen and heard witnesses, considerable deference must be accorded to the trial court's findings as to the credibility of the witnesses. *Seals v. England/Corsair Upholstery Mfg. Co.*, 984 S.W.2d 912, 915 (Tenn. 1999). Using the standard under Rule 13(d) of the Tennessee Rules of Appellate Procedure, the trial court's specific findings of fact are first reviewed to

determine whether they are supported by the preponderance of the evidence; these facts are presumed to be correct unless the evidence preponderates against them. Tenn. R. App. P. 13(d); *Union Carbide Corp. v. Huddleston*, 854 S.W.2d 87, 91 (Tenn. 1993). We then determine whether the combined weight of the facts, as found by the trial court or as supported by the preponderance of the evidence, clearly and convincingly establish all of the elements required to terminate the biological parent's parental rights. *In re Tiffany B.*, 228 S.W.3d at 156; *In re S.M.*, 149 S.W.3d 632, 640 (Tenn. Ct. App. 2004). The trial court's conclusions of law, including its conclusion that the State presented clear and convincing evidence to support termination, are reviewed *de novo* on the record, affording them no presumption of correctness. *In re Tiffany B.*, 228 S.W.3d at 156; *Campbell v. Florida Steel Corp.*, 919 S.W.2d 26, 35 (Tenn. 1996); *Presley v. Bennett*, 860 S.W.2d 857, 859 (Tenn. 1993).

### ANALYSIS

### *Reasonable Efforts*

The Tennessee General Assembly has explicitly recognized "family . . . as the fundamental building block of our society." T.C.A. § 36-3-113(a) (2005). Accordingly, the State is authorized to remove a child from the care of his parents "only when necessary for such child's welfare or in the interest of public safety," and children are to be "protect[ed] from unnecessary separation from parents" who will care for them. T.C.A. § 37-1-101(a)(3) (2005 & Supp. 2009) and §37-2-401(a) (2005). Once a child is removed from the family, "the first priority should be to reunite the family if at all possible." *In re Tiffany B.*, 228 S.W.3d at 157. Thus, any separation "should be for only as long as is necessary to preserve, repair, or reunify the family." *Id.*

Under the Tennessee statutes governing the termination of the parental rights of a biological parent, in most instances in which a child has been removed from the parent's home, DCS is required to make "reasonable efforts" to reunify the parent with the child.[27] The statute elaborates on the meaning of "reasonable efforts":

> (g)(1) As used in this section, "reasonable efforts" means the exercise of reasonable care and diligence by the department to provide services related to meeting the needs of the child and the family. In determining reasonable efforts to be made with respect to a child, as described in this subdivision

---

[27]DCS is not required to exert reasonable efforts at reunification in circumstances described in Tennessee Code Annotated § 37-1-166(g)(4), such as in cases involving aggravated abuse, neglect, or sexual exploitation. None of these circumstances is present in the instant case.

(g)(1), and in making such reasonable efforts, the child's health and safety shall be the paramount concern.

(2) Except as provided in subdivision (g)(4), reasonable efforts shall be made to preserve and reunify families:

  (A) Prior to the placement of a child in foster care, to prevent or eliminate the need for removing the child from the child's home; and

  (B) To make it possible for a child to safely return to the child's home.

T.C.A. § 37-1-166(g) (2005).[28]

After a child is removed from the home by DCS, the Department is required to prepare an individualized permanency plan directed toward remedying the conditions that led to the child's removal from his parent's custody. *In re Valentine*, 79 S.W.3d at 547; *In re Tiffany B.*, 228 S.W.3d at 158. Parents are responsible for addressing the conditions that led to the removal of the child from the home, and they must make reasonable efforts to rehabilitate themselves once services have been made available to them. *In re Tiffany B.*, 228 S.W.3d at 159. Thus, the permanency plan should include requirements that are reasonably expected to enable the parents to remedy those conditions. *Id.* at 158. However, the parents' ability to rehabilitate themselves may depend on the assistance and support of DCS, and so the permanency plan also allocates to the Department obligations to help reunite the parent and the child. *Id.*

In *In re Georgiana H.*, 205 S.W.3d 508 (Tenn. Ct. App. 2006), the Court elaborated on the standard to which DCS is held in endeavoring to reunite the family:

While the Department's reunification efforts need not be "herculean," the Department must do more than simply provide the parents with a list of services and send them on their way. The Department's employees must use their superior insight and training to assist the parents in addressing and completing the tasks identified in the permanency plan. . . . [T]he Department's reunification efforts are "reasonable" if the Department has exercised "reasonable care and diligence . . . to provide services related to

_____

[28]Effective May 10, 2010, Tennessee Code Annotated § 36-1-102(1)(A)(ii) was amended to include a provision stating that "[t]he efforts of the department or agency to assist a parent or guardian in establishing a suitable home for the child may be found to be reasonable if such efforts exceed the efforts of the parent or guardian toward the same goal, when the parent or guardian is aware that the child is in the custody of the department." This amendment, while not applicable in this case, would not alter the result in this appeal.

meeting the needs of the child and family." Tenn. Code Ann. § 37-1-166(g)(1) (2005). The reasonableness of the Department's efforts depends upon the circumstances of the particular case. The factors that courts use to determine the reasonableness of the Department's efforts include: (1) the reasons for separating the parent from his or her children, (2) the parent's physical and mental abilities, (3) the resources available to the parent, (4) the parent's efforts to remedy the conditions that required the removal of the children, (5) the resources available to the Department, (6) the duration and extent of the parent's remedial efforts, and (7) the closeness of the fit between the conditions that led to the initial removal of the children, the requirements of the permanency plan, and the Department's efforts.

*In re Georgiana*, 205 S.W.3d at 519 (citations and footnotes omitted). It is not reasonable for the Department to direct reunification efforts toward matters of little consequence. *Id.* at 519 n.24. While the Court is cognizant of DCS budgetary constraints, given the profound consequences associated with the termination of a biological parent's parental rights, the Court cannot accept budgetary concerns to justify the Department's failure to make reasonable efforts to reunify a parent and child. *See In re Tiffany B.*, 228 S.W.3d at 158. The State has the burden of showing by clear and convincing evidence that it brought its skills, experience, and resources to bear in a reasonable way to bring about the reunification of the family. *Id.* at 160.

In the instant case, Father asserts that DCS's assistance with respect to the various assessments and parenting classes was unreasonable. Father claims that even after he informed Davis, the second case manager, that he had completed the mental health assessment and the A&D testing, DCS employees made little or no effort to obtain copies of necessary documentation showing that it had been done. Furthermore, DCS only visited Father's home one time to determine if it was suitable for C.A.C. Case manager Davis admitted that this was substandard. Father contends that, overall, DCS efforts consisted essentially of furnishing him with telephone numbers and periodically reading the permanency plan requirements to him, and this does not amount to reasonable efforts.

In response to the issue raised by Father, DCS primarily points its finger back at Father. While DCS concedes that Father's assertion that DCS workers did not follow up to ascertain if he had accomplished requirements such as his mental health and A&D assessments "may have some merit," DCS protests that DCS employees "were not the direct service providers." DCS claims that Father availed himself of the services provided by DCS, but did not verify his actions to DCS. It contends: "The problem is not that DCS did not make the efforts; [Father] got the recommended services . . . . The problem is that [Father] did not benefit from the services." (DCS Brief at 18 (citing *State v. C.W.W.*, 37 S.W.3d 467 (Tenn. Ct. App.

-25-

2000), and ***In re C.S., Jr.***, No. M2005-02499-COA-R3-PT, 2006 WL 2644371, at \*14-15 (Tenn. Ct. App. Sept. 14, 2006)). DCS also argues that Father's "drug abuse and criminality are two prime concerns in this case." ***Id.*** It notes that Father was provided drug treatment in the Fall of 2008, but he did not stay in treatment because of his "refusal to quit abusing drugs." ***Id***. Furthermore, DCS argues, any failure by DCS to make reasonable efforts did not cause Father to be convicted of both theft and possession of drug paraphernalia while C.A.C. was in DCS custody. Therefore, DCS claims, Father's argument is not a basis for reversing the termination of his parental rights.

The issue of whether DCS made reasonable efforts to reunite parent and child was discussed at length in ***In re Tiffany B.***, ***supra***. In that case, DCS removed two children from the parents' home.[29] The children were found to be dependent and neglected and remained in DCS custody. The mother and father had problems maintaining a stable home, maintaining stable employment, refraining from domestic violence, and managing their addiction to crack cocaine. Because of their drug addiction, they committed petty crimes to obtain money to purchase drugs. As a result of their criminal activity, they spent much of their time in jail while the children were in DCS custody. ***In re Tiffany B.***, 228 S.W.3d at 151.

When the children in ***In re Tiffany B.*** were placed in DCS custody, the mother entered a drug treatment program, but her counselors declined to recommend therapy for the mother because she was not forthcoming about her addiction. Over the year the children were in DCS custody, the mother and the father spent much time in jail, and when they were out of jail, they had no fixed residence and no access to a telephone. ***Id.*** at 160 n.20. The parents rarely communicated with the DCS case managers. The case managers blamed this lack of communication on the parents, saying that they could not locate the parents because they were always "on the run." ***Id.*** at 160. The parents also could not secure stable employment or prepare a home for the child. Eventually, DCS filed a petition to terminate the parents' rights based on, among other things, failure to comply with the permanency plan, persistent conditions preventing the children's safe return to the home, and abandonment for failure to visit, support, or provide a suitable home for the children. The parents later tested positive for cocaine and marijuana. The mother entered into a six-month drug treatment program and eventually found employment. ***Id.*** at 154.

While the parents in ***In re Tiffany B.*** were in drug treatment, the trial court conducted its trial on the DCS petition to terminate their parental rights. The trial court held that clear and convincing evidence established that, under the circumstances, DCS had made reasonable efforts to reunify the parents with the children and terminated their parental rights. ***Id.*** The

---

[29]The father involved in the ***Tiffany B.*** case was actually the biological father of only one of the children. ***In re Tiffany B.***, 228 S.W.3d at 151.

appellate court reversed, finding that the DCS efforts to assist the parents in completing their responsibilities under the permanency plan were not reasonable. The appellate court noted that the record contained little evidence of DCS's attempts to locate or assist the mother in being reunified with her children. *Id.* at 159. While the case managers had some personal contact with the mother and the father, they did not attempt to communicate with them in writing and did not follow-up to help them obtain rehabilitative services. *Id.* at 159-60. Also, the appellate court noted that, while DCS blamed its lack of communication on the parents, the evidence showed that the parents had no money, and thus had no fixed residence or access to a telephone and were not intentionally being evasive. *Id.* at 160 n.20. The court stated that the record left "a distinct impression" that DCS put little effort into either locating the parents or providing assistance to parents who were addicted to crack cocaine, homeless, unemployed, and facing criminal charges. The *In re Tiffany B.* court reasoned:

> [T]he Department apparently expected the parents to initiate the remedial efforts on their own and to ask their case manager for help. This expectation was unreasonable. In circumstances that do not involve serious physical abuse or harm to the child, the law does not permit the Department to be passive when it removes children from their parents' custody. The law requires the Department to bring its skills, experience, and resources to bear in a reasonable way to bring about the reunification of the family. The Department has not presented clear and convincing evidence that it did so in this case.

*Id.* at 160. Under these circumstances, the court found that DCS did not make reasonable efforts to assist these parents, and so the termination of their parental rights was reversed and the case was remanded for further proceedings. *Id.*

In light of these standards, we analyze whether DCS's efforts were reasonable in this case. DCS's initial actions were clearly appropriate; there was some indication that C.A.C. may have been subjected to physical abuse, and Father and Stepmother conceded that C.A.C.'s behavior issues had escalated to the point that they could no longer control him. There is no dispute but that taking C.A.C. into protective custody was the correct course of action.

C.A.C. was immediately transferred to a facility in Memphis, some five to six hours from Father's home. We presume that there was no closer facility available that was appropriate for C.A.C., given the significant behavior issues involved. However, moving C.A.C. such a distance from Father creates an obvious impediment to reunification of the family.

At that point, the obvious appropriate action by DCS would be to probe whether Father, who clearly had little means, had the ability to travel to and from Memphis to maintain contact with his son. There is no evidence that any case manager even asked Father whether he had

the ability to go see C.A.C. Dismissive testimony such as DCS case manager Jeffers' testimony that "It's up to the parents to get wherever the child is located. We don't do transportation," is clearly an inappropriate response to obstacles to visitation created by DCS. In addition, the accuracy of this assertion is questionable in light of the fact that transportation and lodging were in fact arranged for Mother in Ohio.

Another impediment to reunification arose in the form of the Youth Villages directive temporarily prohibiting telephone contact between C.A.C. and Father. Again, we presume that this directive was imposed for legitimate therapeutic reasons, to allow Youth Villages personnel to ascertain the reason why C.A.C. would hit his head against a wall after talking to Father and to evaluate the effect on C.A.C. of reduced contact with Father. After that, however, each DCS case manager in turn was simply passive concerning the directive. The case managers testified that they were in touch with C.A.C. periodically, and even saw him occasionally. However, there is no indication in the record that any DCS case manager asked why C.A.C. had been hitting his head against a wall, ever asked Youth Villages personnel whether discontinuing telephone contact with Father had been of therapeutic value to C.A.C., or made efforts to determine when the directive could end in order to facilitate communication between C.A.C. and Father. Indeed, when Father inquired of DCS case manager Davis about the directive, Davis deflected Father by misinforming him that he would have to go to court in order to talk to his son on the telephone.

From the record, it appears that either Youth Villages personnel or DCS personnel, or both, initially saw Mother as the likely eventual custodial parent, who could take custody of C.A.C. in Ohio, obviating the need for DCS to rehabilitate C.A.C.'s relationship with Father and Stepmother in Tennessee. This, of course, did not work out.

Meanwhile, when DCS first took C.A.C. into protective custody, an initial permanency plan was drawn up. At that point, DCS personnel could not know the reasons for C.A.C.'s behavioral problems or Father's inability to control them, so the permanency plan was necessarily broad-based and generic. Father was required to get a mental health assessment, an A&D assessment, take parenting classes, maintain stable employment and ensure that his home was suitable for C.A.C.'s return to his custody. Father was also required to verify to DCS that he had fulfilled each responsibility. All of these generic requirements were appropriate to help DCS determine if Father had underlying problems and to ensure that the home to which C.A.C. would return was safe and stable.

After that, however, each DCS case manager in turn appeared to go on autopilot.[30] The assistance provided to Father consisted of giving him telephone numbers for the various services, such as obtaining the mental health and A&D assessment, as well as parenting education.[31] The series of DCS case managers did not communicate with Father, did not communicate with each other, and did not meaningfully collaborate with Youth Villages personnel.[32] The contacts with Father consisted of periodic required team meetings in which the generic requirements of the permanency plan were read to him, and contact information for DCS personnel was written on a board. Follow-up, even to verify the tasks that Father told case managers he had accomplished, was perfunctory at best.

More importantly, there is no evidence in the record that any of the DCS personnel tried to dig deeper into the case to ascertain the family's underlying problems and determine what measures could reasonably be taken to address them. For example, the permanency plan required Father to have stable employment to support the family. This is no easy feat for someone with Father's challenges, a forty-year-old man with a tenth grade education and multiple physical disabilities, whose income had always been derived primarily from physical work such as construction and masonry. Father, a seeming candidate for disability benefits, testified that he had tried at least twice to secure disability benefits, with no success, and gave up trying, commenting, "I've got to keep working." There is no evidence in the record that any DCS personnel spoke to Father about his employment challenges, to ascertain whether additional training would be helpful, or to connect him with additional resources for either employment or another attempt to obtain disability benefits. Instead, Father was left "to fend for [him]self." *In re M.A.P.*, No. W2008-01352-COA-R3-PT, 2009 WL 2003357, at *18 (Tenn. Ct. App. July 10, 2009).

---

[30]We are cognizant of the fact that C.A.C. was placed with Youth Villages soon after he was taken into State protective custody. The relationship between Youth Villages and DCS is not explained in the appellate record, but apparently Youth Villages was charged with responsibility for C.A.C.'s treatment. Regardless, DCS retained overall responsibility for reunifying C.A.C. with his family, if possible, and for deciding whether to seek termination of Father's parental rights. These fundamental decisions cannot be made in the absence of information from those providing treatment regarding his condition, plan of care, and prognosis, to ascertain where the child's best interests lie.

[31]Jeffers could not even recall the telephone numbers she provided to Father, guessing that she "probably recommended a phone number" for parenting education.

[32]Case manager Davis was aware that Youth Villages had precluded telephone contact, but indicated no awareness of the reason for the directive or that it was intended to be temporary. Davis was aware of Father's transportation challenges but apparently did not inform the next case manager, Baird. Baird indicated no awareness of the Youth Villages no-contact directive. Case manager Jeffers' testimony was uninformed, even cavalier.

-29-

Even more significant, there is no evidence in the record that DCS personnel made any attempt to ascertain and understand the cause of C.A.C.'s initial, and continuing, behavioral problems.[33]   If DCS case managers spoke to Youth Villages counselors about these issues, there is no indication of that in the record.  Certainly there is no indication that DCS case managers acquired any insight from their contacts with either C.A.C. or Father.

That, after all, is what is meant by the requirement that DCS employees "bring their education and training to bear to assist the parents in a reasonable way to address the conditions that required removing their children from their custody."  *In re Tiffany B.*, 228 S.W.3d at 158; *see In re Giorgianna H.*, 205 S.W.3d at 519.  Doing so requires no additional budgetary resources; rather, it requires capable and trained DCS personnel to employ their skills to gain insight into the underlying problems for the child and the family, and then use that acquired insight to tailor a permanency plan that addresses the root problems and to provide available resources to assist both the child and the parent.

None of this was done in this case.  There is no indication that DCS personnel or Youth Villages personnel spoke to Father substantively to either acquire his views as a parent of the cause of C.A.C.'s initial and continuing behavioral problems, or to include him in C.A.C.'s plan of care.  There is no indication in the record that DCS case managers spoke to C.A.C.'s Youth Villages foster care counselor, Candace Neill, about the cause of C.A.C.'s problems or his plan of care.  Even counselor Neill testified that, when she attended required DCS team meetings which Father attended, she did not speak directly to him.  Asked if she ever contacted Father, she recited that she fulfilled the "requirement" of "one birth family contact per month" by calling a non-working telephone number for Father.  Similar questions asked of the DCS case managers elicited comparable rote responses.  Simply checking off the boxes for DCS requirements does not substitute for real thought and effort to effect the reconciliation and reunification of the family.

The efforts by DCS in this case involved primarily ascertaining whether Father had completed tasks under the generic permanency plan, such as providing DCS with documentation of his mental health and A&D assessments.  It was known by all involved that such assessments had been done; Father's infraction was in failing to get the documentation

---

[33]Several pertinent questions are readily apparent from this record:  Was Father correct in his belief that C.A.C. began acting out in reaction to Father's marriage to Stepmother?  Was Father correct that C.A.C. began hitting his head against a wall after telephone conversations with Father because he missed Father and wanted to come home?  Was there merit to Father's belief that family counseling would help reconcile C.A.C. and their family and help C.A.C. return to his home?  If solo therapy, powerful medications, and separation from Father have not resulted in any discernable improvement in C.A.C.'s behavior, and if C.A.C. continues to insist that he loves Father and wants to return home, is continuing the same course of action the best approach?  If these important questions were asked by anyone, it is not reflected in the appellate record.

to DCS. In the context of this case, that is a minor infraction indeed. Department efforts directed "toward matters of little consequence" are not reasonable. *In re Giorgianna H.*, 205 S.W.3d at 519 n.24.

Moreover, it is the job of the juvenile court along the way to "independently determine that the remedial efforts the Department proposes to engage in are reasonable." *In re C.M.M.*, No. M2003-01122-COA-R3-PT, 2004 WL 438326, at *6 (Tenn. Ct. App. Mar. 9, 2004). In this case, all parties frankly conceded at trial that, despite the fact that C.A.C. had been removed from the home for over a year and had received months of individual counseling and an array of medications, C.A.C. had basically not improved from the time he was removed from Father's custody. Receiving this testimony, however, did not prompt the trial court in this case to question the direction DCS had taken in this case, or even to question whether DCS efforts were reasonable. Termination of parental rights should not be the "default" position; such an approach is clearly contrary to the policy established by our Legislature, that if children must be removed from the parents' custody, "the first priority should be to reunite the family if at all possible." *In re Tiffany B.*, 228 S.W.3d at 157.

The State argues on appeal that any lack of reasonable efforts on its part did not make a difference in this case because of Father's failings. The State contends first that Father "continued a career of criminality" and "drug abuse." The evidence on this allegation consists of (1) a single methamphetamine charge that was later dismissed, (2) a single drug test that was positive for methamphetamine, with no indication that Father subsequently used methamphetamine, (3) a single charge for theft from Stepmother's employer, for which Father paid a fine, and (4) a drug paraphernalia charge arising from Father's possession of syringes for his Oxycodone prescription. Father was referred for drug treatment, which he explained that he did not complete because the program required him to give up the pain medicine legally prescribed for the degenerative bone condition from which he had suffered since the age of twelve.[34] While all of this merits attention, none of it goes to the underlying cause for C.A.C.'s continuing behavioral problems. The State's use of hyperbole, in characterizing Father as having engaged in "a career of criminality and drug abuse," is not helpful in responsibly evaluating the efforts of both Father and DCS in this case.

The State also sniffs on appeal that Father "exhibited no better understanding at trial of how he could address [C.A.C.'s] issues than he did at the time of removal." This assertion is ironic indeed. Despite months of residential treatment, a phalanx of experts, including doctors, counselors, and specially trained foster parents, and an array of powerful medicines, GAL Asbury reported to the trial court that he was "keenly concerned that [C.A.C.'s]

---

[34]After Father failed to complete the drug treatment program, DCS did not contest Father's continuing to live in the family's home with Stepmother's two daughters.

behavior is not getting any better since he has been in [State] custody," and "the issues they are struggling with are the same issues that we have been struggling with since he was initially removed." C.A.C.'s lack of progress only highlights DCS's failure to exert efforts to ascertain and address the root causes of C.A.C.'s problems. In point of fact, Father, in insisting that DCS should provide family counseling and other support to enable C.A.C. to return home, may have come closest to hitting the nail on the head.

Under these circumstances, we must conclude that the State failed to carry its burden of proving by clear and convincing evidence that it made reasonable efforts to reunify C.A.C. with Father. The holding of the trial court on this issue is reversed.

### *Best Interest*

Although the termination of Father's parental rights may be reversed on the basis of DCS's reasonable efforts, we feel compelled to briefly address the trial court's finding on the best interest of the child, as the child's best interest is always of primary importance.[35] ***See*** T.C.A. § 36-1-113(i) (2005 & Supp. 2009).

In holding that Father's parental rights should be terminated, the trial court found that termination of his parental rights was in C.A.C.'s best interest. This was based in part on the trial court's factual finding that "[t]here is no meaningful relationship between . . . [Father] and the child, [C.A.C.]."

We look first at whether this specific factual finding is supported by a preponderance of the evidence. In this case, the finding that there is no meaningful relationship between Father and C.A.C. is supported by virtually no evidence in the record. Indeed, the record includes very substantial evidence to the contrary, despite the fact that C.A.C. has been prevented from having any significant contact with Father while he has been in State custody. C.A.C.'s Youth Villages counselor, Ms. Neill, testified that C.A.C. told her that he loves Father, admires him, looks up to him, and misses home. GAL Asbury reported to the trial court that Neill's testimony confirmed that C.A.C. "told her the same things as he does me. . . . He is adamant that he would like to go home."

---

[35]As to the trial court's holding on the ground of persistent conditions, we note our concern about the trial court's apparent finding that C.A.C.'s continued behavioral problems after being taken into State custody constituted a "condition[] that led to [C.A.C.'s] removal that . . . still persist[s]." T.C.A. § 36-1-113(g)(3)(A). If this was in fact the trial court's finding, it would be a disturbing interpretation of this statute. The child's continuing distress while in State protective custody cannot be deemed a "persistent condition" of the *parent* within the meaning of the statute. Father did not, however, challenge the trial court's decision on this issue.

Youth Villages personnel reported that C.A.C. would hit his head against a wall repeatedly after hanging up from telephone conversations with Father. There is no indication in the record that Father did anything to cause this; the only explanation in the record is Father's testimony that C.A.C. would hit his head against the wall because he wanted to return home. Similarly, foster mother Wheatley testified that C.A.C.'s behavior took a turn for the worse after C.A.C. saw Father at a DCS team meeting just before Christmas 2008, after not having any contact with Father for many months. All of this is substantial evidence that C.A.C. loves Father and misses his home with Father. Overall, we find insufficient support in the record for the trial court's finding that there is "no meaningful relationship" between C.A.C. and Father.

In some instances, the Court must conclude that the evidence clearly and convincingly shows that termination of the parental rights of the biological parent is in the best interest of the child, even in the face of evidence that the child continues to care for the parent. This is not such a case.[36] Thus, from the record as a whole, we find that the evidence does not support the trial court's conclusion that DCS established by clear and convincing evidence that termination of Father's parental rights is in C.A.C.'s best interest.

**CONCLUSION**

"No civil action carries with it graver consequences than a petition to sever family ties irretrievably and forever." *In re Tiffany B.*, 228 S.W.3d at 155. The parental rights of biological parents should be terminated only upon clear and convincing evidence of each and every element required under the Tennessee statutes. *Id.* at 156. Here, the evidence in the record does not support the finding that DCS's efforts were reasonable under the circumstances, or that termination is in the child's best interest. Accordingly, we reverse the trial court's termination of Father's parental rights.

The decision of the trial court is reversed, and the cause is remanded for further proceedings consistent with this Opinion. Costs of this appeal are assessed against Appellee the State of Tennessee, for which execution may issue if necessary.

_____
HOLLY M. KIRBY, JUDGE

---

[36]Even the testimony of C.A.C.'s current foster parent did not indicate that C.A.C. had formed a parental bond with the foster parents. She could provide only rather tepid testimony that, despite "some trials," their relationship was "pretty good." She reported no significant improvement in C.A.C.'s behavior while in her care.